# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

WILLIAM ILLITCH,
       Plaintiff,

Case No. 1:17-cv-835
Litkovitz, M.J.

vs.

COMMISSIONER OF
SOCIAL SECURITY,
       Defendant.

**ORDER**

       Plaintiff William Illitch brings this action pursuant to 42 U.S.C. § 405(g) for judicial

review of the final decision of the Commissioner of Social Security ("Commissioner") denying

his application for disability insurance benefits ("DIB"). This matter is before the Court on

plaintiff's statement of errors (Doc. 13), the Commissioner's response in opposition (Doc. 18),

and plaintiff's reply (Doc. 21).

## I. Procedural Background

       Plaintiff protectively filed his application for DIB on May 8, 2013, alleging disability

since March 1, 2013, due to myelomalacia, non-operative long-term spinal cord compression,

gunshot wound to the stomach, neck injury, spine injury, post-laminectomy syndrome, cervical

stenosis, brachial neuritis, and "right knee." (Tr. 212). The application was denied initially and

upon reconsideration. Plaintiff, through counsel, requested and was granted a *de novo* hearing

before administrative law judge ("ALJ") Christopher S. Tindale. Plaintiff and a vocational

expert ("VE") appeared and testified at the ALJ hearing on October 26, 2016. (Tr. 35-69). On

January 27, 2017, the ALJ issued a decision denying plaintiff's DIB application. (Tr. 13-34).

This decision became the final decision of the Commissioner when the Appeals Council denied review on October 18, 2017. (Tr. 1-6).

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§

404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four

steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548

(6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th

Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

> 1. The [plaintiff] last met the insured status requirements of the Social Security
> Act on December 31, 201[6].
>
> 2. The [plaintiff] did not engage in substantial gainful activity during the period
> from his alleged onset date of March 1, 2013 through his date last insured of
> December 31, 2016 (20 CFR 404.1571 *et seq.*).
>
> 3. Through the date last insured, the [plaintiff] had the following severe
> impairments: Disorders of the spine and degenerative joint disease (20 CFR
> 404.1520(c)).
>
> 4. Through the date last insured, the [plaintiff] did not have an impairment or
> combination of impairments that met or medically equaled the severity of one of
> the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR
> 404.1520(d), 404.1525 and 404.1526).
>
> 5. After careful consideration of the entire record, the [ALJ] finds that, through
> the date last insured, the [plaintiff] had the residual functional capacity to perform
> sedentary work as defined in 20 CFR 404.1567(a) except for the following

restrictions: He can occasionally climb ramps and stairs but can never climb ladders, ropes or scaffolds. He can frequently balance, kneel, and crouch but can only occasionally stoop and crawl. He can frequently handle and finger and feel bilaterally. He can frequently push/pull with bilateral upper extremities.

6. Through the date last insured, the [plaintiff] was unable to perform any past relevant work (20 CFR 404.1565).[2]

7. The [plaintiff] was born [in] . . . 1971 and was 42 years old, which is defined as a younger individual age 18-44, on the date last insured. The [plaintiff] subsequently changed age category to a younger individual age 45-49 (20 CFR 404.1563).

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the [plaintiff] could have performed (20 CFR 404.1569 and 404.1569(a)).[3]

11. The [plaintiff] was not under a disability, as defined in the Social Security Act, at any time from March 1, 2013, the alleged onset date, through December 31, 2013, the date last insured (20 CFR 404.1520(g)).

(Tr. 18-30).

---

[2] Plaintiff's past relevant work was as a forklift driver, a semi-skilled job which plaintiff performed at the medium level of exertion. (Tr. 28, 56-57).

[3] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative unskilled, sedentary jobs such as call-out operator (14,000 jobs in the national economy); telephone information clerk (37,200 jobs in the national economy); and document preparer (21,770 jobs in the national economy). (Tr. 29).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a two-fold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

**D. The medical evidence**

Plaintiff suffered a work injury in 2007 for which he obtained workers compensation benefits. (Tr. 459-65). An EMG performed in February 2010 was abnormal and showed evidence of a left C7 radiculopathy. (Tr. 314). A cervical spine MRI performed in July 2011 disclosed degenerative changes of the cervical spine at multiple levels, most significant at C5/C6. (Tr. 313). Neurosurgeon Dr. Tann Nichols, M.D., evaluated plaintiff on March 23, 2012, at the request of plaintiff's treating pain management physician, Dr. Mitchell Simons, M.D. (Tr. 307-08). Plaintiff complained of neck pain and bilateral arm numbness which had worsened over the preceding one to two years. He had trouble using his hands and dropped things frequently. Muscle strength and tone were normal, bulk frequent spasms were noted in both arms, and range of motion was mildly restricted. Dr. Nichols opined that an MRI of the cervical spine performed on July 19, 2012 demonstrated significant stenosis at C5/C6 with cord compression and signal change[1] seen on imaging. Plaintiff was diagnosed with cervical myelopathy[2] and radiculopathy on examination with cord compression and signal change within the cord at C5/C6, which had been progressive over several years. Dr. Nichols stated: "[Plaintiff] understands that due to the long course of this as well as the presence of signal change on MRI he may not receive much benefit from this and his symptoms may actually continue to progress. However, if not treated the compression will likely continue to worsen his condition over time. . . . I have also requested a new MRI due to the age of his current study

---

[1] An MRI captures both T1 and T2 signals, and the contrast from the two image types assists in the diagnosis of spinal abnormalities and inflammation. https://www.reference.com/health/t2-signal-mri-4d622b2cf6632403.

[2] "Myelopathy" is "any functional disturbance or pathological change in the spinal cord." https://medical-dictionary.thefreedictionary.com/myelopathy.

prior to any surgical procedures." (Tr. 308). A cervical MRI performed on August 17, 2012

showed degenerative disease most severe at the C5/C6 level with ischemic/gliotic T2-weighted

changes involving the spinal cord. (Tr. 305).

Dr. Nichols performed an anterior cervical discectomy for decompression and arthrodesis

at C5/C6, with placement of hardware on August 22, 2012. (Tr. 295). Plaintiff was found to

have cervical myelopathy and cord signal change with severe stenosis at the C5/C6 level. (Tr.

295). His chief complaint was neck and arm pain and upper extremity numbness and weakness.

(Tr. 301). Post-surgery, Dr. Nichols reported that plaintiff was better than before surgery

overall. (Tr. 289). However, Dr. Nichols "again discussed the course of recovery from

myelopathy, especially with [plaintiff's] over five years of symptoms and spinal cord signal

change," and opined that plaintiff "is certainly not going to get the rapid total improvement he

was hoping for and will likely have at least some degree of residual symptoms. . . ." (*Id.*).

Dr. Nichols saw plaintiff for follow-up on December 6, 2012, approximately 14 weeks

post- surgery, and reported:

> Overall, he is improved following surgery but still has significant pain and
> numbness/tingling; especially in the left arm. He has returned to work with some
> difficulty but is able to perform. . . . At this point I do not think any further
> surgery would help him further. He has had several years of spinal cord
> compression and signal change for well over a year prior to surgery and while he
> will likely continue to improve to some degree it is going to take time and he will
> likely have some long term permanent deficit.

(Tr. 287). Dr. Nichols reported that plaintiff would continue with pain management. (*Id.*).

On March 20, 2013, Dr. Nichols spoke with plaintiff on the phone regarding his

complaints of increased symptoms "similar to prior with numbness and tingling into both arms

and some increased neck pain." (Tr. 285; Tr. 482). Dr. Nichols noted that plaintiff had a history

of single level stenosis with myelomalacia and he planned to order an MRI to assess whether

there was any residual or new cord compression. (*Id.*). On April 5, 2013, a cervical MRI was

performed and a comparison study was made with the cervical spine MRI from April 13, 2012.

(Tr. 266; Tr. 479-80). The impression was:

1. Cord signal abnormality at C5-C6 likely related to myelomalacia/gliosis.[3]
2. C3-C4 disc bulge with facet and uncovertebral hypertrophy and moderate right foraminal stenosis along with mild canal stenosis.
3. C4-C5 disc bulge with right uncovertebral and facet hypertrophy, severe right foraminal stenosis, and moderate to severe left foraminal stenosis along with moderate canal stenosis.
4. C5-C6 disc bulge with mild canal stenosis and severe bilateral foraminal stenosis.
5. C6-C7 disc bulge and left central to foraminal protrusion with severe left foraminal stenosis and mild canal stenosis.

(Tr. 480). On April 11, 2013, Dr. Nichols reviewed the MRI and opined: "[N]o ongoing cord

compression, persistence [sic] T-2 signal change. Symptoms likely due to long term spinal cord

compression, no need or benefit from additional surgery. Recommend continue current

therapies." (Tr. 280).

Plaintiff continued to treat with Dr. Simons for pain management following his surgery.

(Tr. 317-334, 336-37, 339-40, 346, 1171-51). Dr. Simons treated plaintiff with pain

medications, including narcotics, and prescribed a spinal cord stimulator, which was implanted

on January 26, 2015. (Tr. 566-633).

On August 31, 2015, plaintiff fell from a roof and sustained thoracic spine fractures, a

fracture of the lumbar spine without cord injury, a hemothorax on the right, a right scapula

fracture, an acetabular fracture on the right, a fracture of coronoid process of right ulna, and

---

[3] Myelomalacia is "[s]oftening of the spinal cord." https://encyclopedia2.thefreedictionary.com/myelomalacia. Gliosis is "[p]roliferation of neuroglia in the brain or spinal cord, either as a replacement process or in response to a low-grade inflammation." https://encyclopedia2.thefreedictionary.com/gliosis.

fractures involving four or more ribs. (Tr. 667). He was hospitalized for one week after he was transported to the University of Cincinnati Medical Center (UCMC) emergency department, and he received rehabilitative care at UCMC and Drake Center until December 2015. (Tr. 634-745, 746-884, 885-984, 985-1110).

Plaintiff continued to receive pain management treatment from Dr. Simons until January 2016, when Dr. Simons was no longer willing to follow plaintiff due to issues with plaintiff's narcotics use, recent noncompliance with treatment, and his improper behavior in the waiting area of the doctor's office during his January office visit. (Tr. 1117). Plaintiff began treating with Dr. Zeeshan Tayeb, M.D., on October 3, 2016. (Tr. 1152-68). Dr. Tayeb saw plaintiff three times in October 2016 before issuing an assessment on November 3, 2016. (Tr. 1169-1173). Dr. Tayeb diagnosed plaintiff with cervical myelomalacia, cervical stenosis, cervical myelopathy, cervical failed surgery syndrome, cervical radiculopathy, multi-level disc herniation, cervical degenerative disease, cervical spondylosis, and depressive disorder. The clinical findings he listed were abnormal MRI and x-ray results, an abnormal EMG of the upper extremities, profound sensory loss of the bilateral upper extremities, profound loss of strength of the upper extremities, loss of fine dexterity, and hypoflexia. He described plaintiff's symptoms as persistent, moderate to severe neck pain; complete loss of tactile sensation, nondermatomal, over the bilateral upper extremities; an inability to perceive temperature; and complete numbness of the bilateral upper extremities. Dr. Tayeb opined that emotional factors contributed to the severity of plaintiff's symptoms and functional limitations and that his experience of pain was severe enough to interfere with his attention and concentration constantly. Dr. Tayeb reported that the side effects of his medications were fatigue, interruption in concentration, and

9

drowsiness. Dr. Tayeb opined that plaintiff's prognosis is poor and his condition was expected to continue to deteriorate. Dr. Tayeb assessed plaintiff's functioning as follows: he can walk 1-2 city blocks without rest or severe pain, continuously sit or stand 15 minutes at one time, sit 2 hours total, and stand/walk less than 2 hours total in an 8-hour workday; he needs to walk every 10-15 minutes for 5 minutes at a time; he needs a job that permits shifting positions at will from sitting, standing or walking, and he will need to take unscheduled breaks 2 to 3 times a day for 10-15 minutes; his legs should be elevated 8 inches for 100% of an 8-hour day; he can only occasionally lift less than 10 pounds; he can use his hands to grasp, turn or twist objects 5-10% of the workday, use his fingers for fine manipulation 5% of the workday, and use his arms for reaching 5% of the workday; and he can stoop or crouch 10% of the workday. Dr. Tayeb opined that plaintiff's condition is likely to produce good days and bad days.

Consultative examining physician Dr. Jennifer Wischer Bailey, M.D., examined plaintiff and completed a report in July 2014. (Tr. 439-446). She also performed manual muscle and range of motion testing. Her impression was neck and upper back pain (1) status post anterior cervical discectomy with fusion, with (2) numbness of the hands and arms. (Tr. 445). She assessed plaintiff as follows:

> In summary this is a middle-aged man who states he is unable to work due to neck and upper back pain. Range of motion of all extremities is completely normal. The patient ambulates with a normal gait and can forward bend and squat without difficulty. The right hand is dominant, and grasp strength and manipulative ability are well-preserved bilaterally. He does have dense numbness of the hands and arms consistent with a prior radiculopathy. The rest of his examination was unremarkable.

(Tr. 445). Based on her examination findings, she reported that plaintiff "appears capable of performing at least a mild to moderate amount of sitting, ambulating, standing, bending,

10

kneeling, pushing, pulling, lifting and carrying heavy objects." (*Id.*). She found he "has no difficulty reaching, grasping and handling objects." (*Id.*). Dr. Bailey attached to her report x-ray results for plaintiff's right knee which showed no significant degenerative process. (Tr. 446).

Non-examining physician Dr. Gary Hinzman, M.D., reviewed the record in August 2014 and found that plaintiff was capable of light work except that he was limited to frequent use of his upper extremities for operation of hand controls and frequent handling, fingering and feeling; he could frequently climb ramps/stairs and kneel, crouch, crawl and balance; he could occasionally stoop; and he could never climb ladders/ropes/scaffolds. (Tr. 77-79). Non-examining physician Dr. Michael, Delphia, M.D., reviewed the record and affirmed Dr. Hinzman's assessment on reconsideration in December 2014. (Tr. 90-91).

In his decision, the ALJ assigned "little" weight to Dr. Tayeb's assessment due to the short period treatment period and few number of office visits, the limited treatment he provided, the "grossly normal" clinical signs he documented and failure to perform diagnostic testing, and the limited substantiation for his findings in the record; "some" weight to Dr. Bailey's assessment due to the vague nature of her restrictions and the lack of a function-by-function assessment; and "some" weight to the the non-examining physicians' assessments because while their assessments that plaintiff could perform a restricted range of light work with postural and manipulative restrictions were largely consistent with the record, including his successful pain management and daily activities, additional medical evidence had been provided since their review of the record in December 2014, including evidence related to the August-September 2015 injuries and hospitalization, which warranted additional functional restrictions. (Tr. 27-28). The ALJ found that Dr. Tayeb's October 2016 treatment records indicated that plaintiff had

improved "somewhat" as compared to March 2014 records, which documented "greater reduced strength and a poorer walking ability." (Tr. 27, citing Tr. 1152-1168, 317-437). The ALJ found that a light exertional limitation was now "more appropriate" based on the improvement documented by Dr. Tayeb's records, but the ALJ concluded that a residual functional capacity for sedentary work with postural and manipulative restrictions accurately represented plaintiff's "functional limitations for the majority of the period in question." (Tr. 27).

### E. Specific Errors

On appeal, plaintiff alleges that the ALJ erred by: (1) finding that plaintiff did not meet Listing 1.04A, which covers disorders of the spine; (2) failing to accord the opinion of treating physician Dr. Tayeb controlling weight; and (3) failing to consider the record as a whole and/or adequately explain his decision. (Docs. 6, 12).

### 1. Step three error/Listing 1.04A

Plaintiff alleges that the ALJ erred at step three of the sequential evaluation process by finding that his degenerative disc disease did not meet § 1.04A of the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04A, because plaintiff "does not have evidence of nerve root compression or the requisite neurological deficits." (Doc. 13 at 8; Tr. 24). At the third step in the disability evaluation process, a claimant will be found disabled if his impairments meet or equal a listing in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010). The Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20

C.F.R. § 404.1525(a). Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 404.1525(c)(3). A claimant must satisfy all of the criteria to "meet" the listing. *Id.*; *Rabbers*, 582 F.3d at 653. In addition, the regulations require that the requisite abnormal findings must be established over a period of time: "Because abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00D.

If a claimant's impairment does not meet a listed impairment, the claimant will still be found disabled at step three if his impairment is the medical equivalent of a listing. 20 C.F.R. § 404.1520(a)(4)(iii). To be the medical equivalent of a listed impairment, a claimant's impairment must be "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). An impairment is medically equivalent to a listing if medical findings related to the impairment are at least of equal medical significance to the findings necessary to meet the Listing. 20 C.F.R. § 404.1526(b)(1). *Tipton v. Commr. of Soc. Sec.*, No. 2:14-cv-1209, 2015 WL 3505513, at *5 (S.D. Ohio June 3, 2015) (Report and Recommendation), *adopted,* 2015 WL 3952347 (S.D. Ohio June 29, 2015). To the extent an individual claims his impairments are equivalent in severity to a listing, he bears the burden of presenting "medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in the original). The ALJ is required to compare the medical evidence with the components of listed impairments in considering whether the condition is equivalent in severity to the medical findings for a listed impairment. *See Lawson v. Comm'r of Soc. Sec.*, 192 F. App'x 521, 529 (6th Cir. 2006). When

performing this analysis, the ALJ must "consider all evidence in [the] case record about [the claimant's] impairment(s) and its effects on [the claimant] that is relevant to this finding." 20 C.F.R. § 404.1526(c).

Plaintiff argues that the ALJ's step three finding is not supported because the ALJ found he suffered from "'severe' degenerative spine disease, disorders of the spine," and plaintiff produced evidence that satisfies every requirement of Listing 1.04A. (Doc. 13 at 8). Listing § 1.04A covers "Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord." 20 C.F.R. Part 404, Subpart P, App 1, § 1.04. The disorder of the spine must be accompanied by:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine). . . .

*Id.*

Thus, to satisfy paragraph A, plaintiff must demonstrate he suffers from a disorder of the spine and demonstrate: (1) neuro-anatomic distribution of pain; (2) limitation of motion of the spine; (3) motor loss (atrophy with associated muscle weakness or muscle weakness); (4) sensory or reflex loss; and, if the lower back is involved, (5) positive straight leg raise test, in both the sitting and supine positions. *Id.*

Under Sixth Circuit law, a cursory step three finding is not necessarily unsupported or erroneous. *Forrest v. Comm'r of Soc. Sec.,* 591 F. App'x 359 (6th Cir. 2014). Rather, the court may uphold a conclusory step three finding if the ALJ's findings at other steps of the sequential

evaluation provide a sufficient basis for the ALJ's step three finding. In *Forrest*, the plaintiff did

not argue before the ALJ that his impairments met or medically equaled in severity a specific

listing. *Id*. at 364. The ALJ found at step three only that "[t]he record does not contain any

clinical findings or diagnostic laboratory evidence of an impairment or combination of

impairments that would meet the requirements for any listed physical impairment." *Id*. The

Court held that the ALJ had adequately completed the step three analysis because the ALJ had

"made sufficient factual findings elsewhere in his decision to support his conclusion at step

three." *Id*. at 366 (citing *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) ("looking

to findings elsewhere in the ALJ's decision to affirm a step-three medical equivalency

determination, and finding no need to require the ALJ to 'spell out every fact a second time'");

*Burbridge v. Comm'r of Soc. Sec.*, 572 F. App'x 412, 417 (6th Cir. 2014) (Moore, J., dissenting)

("acknowledging that an ALJ's step-three analysis was 'cursory' but suggesting that, under

[Sixth Circuit] precedent, it is enough for the ALJ to support his findings by citing an exhibit

where the *exhibit* contained substantial evidence to support his conclusion") (emphasis in

original)). The Sixth Circuit in *Forrest* further found that even if adequate support for the ALJ's

step three finding was lacking, the error was harmless because the plaintiff had not shown that

his impairments met or medically equaled the severity of any listed impairment. *Id.* at 366

(citing *Reynolds v. Commr. of Soc. Sec.,* 424 Fed. Appx. 411, 416 (6th Cir. 2011) (ALJ erred by

providing no reasons to support his finding that a specific listing was not met, and the error was

not harmless because the claimant had possibly put forward sufficient evidence to meet the

Listing); *cf. Audler v. Astrue*, 501 F.3d 446, 448-49 (5th Cir. 2007) (the ALJ's failure to provide

an explanation for the step three finding was not harmless where the claimant carried her burden

to show she met a listing)). *See also Layton ex rel. B.O. v. Colvin*, No. 12-12934, 2013 WL 5372798, at **8, 15 (E.D. Mich. Sept. 25, 2013) (the ALJ's failure to perform any analysis in finding a child did not have an impairment that met or equaled the Listing was harmless error where the ALJ compared the evidence to the six domains of functional equivalence and the plaintiff did not identify any "conflicting or inconclusive evidence" that the ALJ failed to resolve or "evidence favorable to the claimant that the ALJ simply failed to acknowledge or consider"; thus, there was no need to speculate as to how the ALJ might have weighed the evidence).

Here, plaintiff alleges that the ALJ's step three finding is not substantially supported by the findings in his written decision. Rather, plaintiff contends that evidence of each of the required elements of Listing 1.04A can be found in the following portions of the record:

1. Neuro-anatomic distribution of pain (Tr. 274-316, 438-446, 1117-73)
2. Limitation of motion of the spine (Tr. 1117-73)
3. Muscle weakness (Tr. 1152-73)
4. Sensory loss (Tr. 438-46, 1117-73)
5. Reflex loss (Tr. 1152-73)

(*Id.* at 8-9). Plaintiff asserts that the most recent MRI of his spine showed severe stenosis, disc displacement, and cord signal abnormalities related to myelomalacia and gliosis, "all conditions indicative of nerve root and cord compression." (*Id.* at 9, citing Tr. 274-316). Plaintiff also notes that his neurosurgeon, Dr. Nichols, opined in his review of plaintiff's MRI results that plaintiff's symptoms were "likely due to long term spinal cord compression." (*Id.*, citing Tr. 280). Plaintiff argues that in light of this evidence, the ALJ erred by making the conclusory finding that he "considered [plaintiff's degenerative disc disease under listing 1.04, but concluded that [plaintiff's] condition does not satisfy the severity requirement of this listed impairment, as he does not have evidence of nerve root compression or the requisite neurological

deficits." (*Id.* at 9; *see* Tr. 24). Plaintiff contends that the ALJ's vague, one-sentence finding is insufficient to allow the Court to meaningfully review the ALJ's finding at step three of the sequential evaluation, particularly in light of: (1) plaintiff's diagnoses of cervical myelopathy, radiculopathy and myelomalacia, conditions which plaintiff contends "imply nerve compression"; (2) MRI and EMG results, which plaintiff alleges "highlight nerve compression"; and (3) "clinical abnormalities such as reflex loss, sensory loss and upper extremity weakness," which plaintiff asserts are "hallmarks of nerve compression." (*Id.* at 13).[4]

The Commissioner argues that the ALJ's failure to explain his step three finding was not error because the ALJ "expressly considered whether plaintiff met the criteria of Listing 1.04A and found that he did not" by stating there is "no evidence of nerve root compression or neurological deficits of the requisite extremes to meet the listing." (Doc. 18 at 4, citing Tr. 24). The Commissioner contends that substantial evidence supports the ALJ's determination that plaintiff's condition did not meet or medically equal the requirements of Listing 1.04A. (*Id.* at 7). The Commissioner argues that although the ALJ's discussion at step three was cursory, it was sufficient in light of the ALJ's consideration of plaintiff's medical history and treatment records at steps four and five and the absence of an opinion by any medical source that plaintiff's impairments met a listing. (*Id.* at 4).[5]

---

[4] Plaintiff presents this particular argument in connection with his third assignment of error, but it relates to his claim that the ALJ erred by finding he did not meet Listing 1.04A. The Court has therefore considered the argument in connection with plaintiff's first assignment of error.

[5] The Commissioner cites two cases for the proposition that while "cursory," the ALJ's finding was sufficient in light of the ALJ's discussion of plaintiff's medical history and medical records at steps four and five of the sequential evaluation. The first case, *Price v. Heckler*, 767 F.2d 281, 284 (6th Cir. 1985), was a widows benefits case where the court found it might very well reach a different conclusion as to the adequacy of the ALJ's findings and disability if the "claimant were a wage earner subject to the more liberal substantial gainful activity test." The second case, *Fischer-Ross v. Barnhart*, 431 F.3d 729, 734 (10th Cir. 2005), does not add anything of significance to binding Sixth Circuit law.

In reply, plaintiff argues that the Commissioner does not deny that he has submitted medical evidence of every element that must be demonstrated to satisfy Listing 1.04A. (Doc. 21 at 1). Plaintiff contends that the medical evidence is sufficient to demonstrate disability at step three, and he urges this Court to apply the same analysis applied by the appellate court in *Minnick to Colvin*, 775 F.3d 929 (7th Cir. 2015) (holding the ALJ's perfunctory step three finding was inadequate and reversing the ALJ's decision where the ALJ failed to acknowledge several aspects of the record that could meet or equal Listing 1.04). (*Id.*).

Here, the ALJ found at step three that plaintiff's degenerative disc disease did not meet or medically equal Listing 1.04 solely because "he does not have evidence of nerve root compression or the requisite neurological deficits." (Tr. 24). The ALJ did not elaborate on his finding at step three. The ALJ did not perform any analysis at step three and did not identify the evidence on which he relied in determining plaintiff's impairments did not meet or equal the severity of § 1.04. The Commissioner argues that the ALJ did not err by failing to elaborate on his conclusion that plaintiff's spine disorder did not meet or equal Listing 1.04 because the ALJ made findings elsewhere in his decision that support his step three finding. (Doc. 18 at 4-5). The Commissioner alleges that the ALJ detailed the medical records documenting the longitudinal history of plaintiff's treatment for his spinal injury, which shows that plaintiff suffered a work injury in 2007 and underwent a C5/C6 cervical discectomy and fusion in August 2012, prior to his alleged onset date; he returned to work in December 2012; post-surgery evidence showed a stable fusion and no recurrent cord compression; plaintiff's neurosurgeon, Dr. Nichols, found in April 2013 that post-surgery MRI results demonstrated no ongoing cord compression; plaintiff received significant relief for continuing pain and other symptoms from

epidural injections, pain medication, anti-inflammatories, and implantation of a spinal cord stimulator in January 2016; clinical findings were largely unremarkable; though plaintiff sustained injuries in a fall on August 15, 2014 which required emergency treatment, his condition soon returned to baseline and no invasive treatment was required; plaintiff's pain management physician, Dr. Simons, subsequently questioned whether plaintiff was using the spinal cord stimulator and pain medications as prescribed in light of plaintiff's continued complaints of pain, which Dr. Simons found to be perplexing; and treating physician Dr. Tayeb indicated in October 2016 that medication decreased plaintiff's pain without causing side effects. (*Id.* at 4-6). The Commissioner contends the ALJ properly gave weight to the opinions of the state agency reviewing physicians that plaintiff did not meet or equal a listing.[6] (*Id.* at 7, citing Tr. 27, 77-79, 90-91). The Commissioner contends that in light of this evidence which was reviewed by the ALJ, the ALJ's step three finding is supported by substantial evidence and should stand.

The Court disagrees with the Commissioner's argument that findings made by the ALJ elsewhere in his decision provide a proper basis for his step three finding. As discussed *infra*, there is medical evidence in the record indicating that following his surgery for relief of spinal cord compression, plaintiff experienced residual neurological deficits. The ALJ acknowledged at other steps of the sequential evaluation that certain symptoms persisted post-surgery, including numbness and tingling. (Tr. 25-27). Further, in weighing the medical opinion evidence, the ALJ recognized that plaintiff experienced symptoms such as reduced strength that had persisted as of

---

[6] The Commissioner alleges that the reviewing physicians, Drs. Hinzman and Delphia, listed codes on their reports which denote their opinion that the claimant's impairments do not satisfy a Listing. The Commissioner does not allege that the ALJ discussed or acknowledged an opinion provided by any medical source as to whether plaintiff's degenerative disc disease met the listing.

March 2014. (Tr. 27, citing Tr. 317-437). However, the ALJ did not discuss whether these symptoms evidenced ongoing neurological deficits that would satisfy the requirements of § 1.04A for some or all of the period of alleged disability. The ALJ made a cursory finding that there was no evidence of the requisite neurological deficits under step three without taking into consideration evidence of symptoms of cord compression which appear to have persisted for some time after plaintiff's surgery. The ALJ did not resolve apparent discrepancies between his finding that no evidence of the requisite neurological deficits existed with evidence which appeared to show neurological defects had persisted post-surgery, including: (1) Dr. Nichols's interpretation of post-surgery imaging results in April 2013 showing a T2 signal that was likely attributable to longstanding spinal cord compression (Tr. 280); (2) evidence of symptoms consistent with neurological deficits post-surgery; and (3) plaintiff's ongoing pain management treatment for the persistent symptoms. (Tr. 24). The ALJ's step three finding, viewed in the context of his written decision and the medical record as a whole, is not substantially supported.

The ALJ's failure to articulate a basis for his step three finding was not harmless error. Plaintiff alleges disability based primarily on cervical myelopathy, stenosis and radiculopathy. (Doc. 21 at 1). Imaging results which pre-date plaintiff's surgery disclosed conditions that did not fully resolve after surgery and which appear to have caused continuing symptoms following his surgery. Pre-surgery imaging showed evidence of a left C7 radiculopathy and degenerative changes of the cervical spine at multiple levels, most significant at C5/C6. (Tr. 313, 314). Following surgery in August 2012, neurosurgeon Dr. Nichols cautioned that because plaintiff had experienced "over five years of symptoms and spinal cord signal change . . . [h]e is certainly not going to get the rapid total improvement he was hoping for and will likely have at least some

degree of residual symptoms. . . ." (Tr. 289). Dr. Nichols reported in December 2012, approximately 14 weeks after the surgery, that although plaintiff was overall improved following surgery, he still had "significant pain and numbness/tingling; especially in the left arm" and that further surgery would not help, explaining: "He has had several years of spinal cord compression and signal change for well over a year prior to surgery and while he will likely continue to improve to some degree it is going to take time and he will likely have some long term permanent deficit." (Tr. 287). Although imaging post-surgery disclosed "no ongoing cord compression," Dr. Nichols indicated in April 2013 that plaintiff's continued symptoms were "likely due to long term spinal cord compression. . ." (Tr. 280). He recommended that plaintiff continue with his current pain management therapies. (*Id*.).

Plaintiff has cited evidence in the record to support a finding that despite experiencing improvement in his condition and achieving some pain relief through ongoing pain management treatment, he suffered from ongoing degenerative disc disease and residual symptoms of spinal cord compression which met or medically equaled in severity each element of Listing 1.04A for some or all of the period of alleged disability. *See Zebley*, 493 U.S. at 531. First, there is evidence of neuro-anatomic distribution of pain, which is generally defined as "complaints of pain directly generated by the compromised nerve"; that is, "the nerve root compression must be causing the pain." *Cates v. Colvin*, No. 12-cv-111, 2013 WL 5326516, at *5 (N.D. Okla. Sept. 20, 2013). Before plaintiff's surgery, in August 2011, the pain was characterized as "severe pain in the shoulder and the arm" and as radiculopathy caused by severe pathology at C5-C6 and C6-C7, worse at C5-C6. (Tr. 343). In February 2012, plaintiff described the pain as a constant pain across his neck with quick electric shock sensations in his neck, upper back and arm. (Tr. 309-

11). Six weeks post-surgery in September 2012, plaintiff continued to have significant neck and arm pain. (Tr. 289). In December 2012, 14 weeks after his surgery, Dr. Nichols reported that plaintiff was overall improved following surgery but still had significant pain and he was to continue with pain management. (Tr. 287). Plaintiff continued to complain of significant neck and arm pain during the period of alleged disability. (Tr. 346). Dr. Simons reported eight months after plaintiff's surgery that there appeared to be some neuropathic pain associated with his condition. (*Id.*). Plaintiff complained of increased symptoms, including neck pain, to Dr. Nichols in March 2013, and Dr. Nichols ordered an MRI. (Tr. 285, 482). Dr. Nichols reported the ongoing symptoms were likely due to long-term spinal cord compression. (Tr. 280). Dr. Simons reported in April 2013 that plaintiff's pain

> seems to follow the C5-6 dermatome pattern despite the surgery we had done last fall. It is still hurting him quite a bit. I offered the [ESI] because it is obviously radicular symptoms going through the C5-6 pattern due to the cervical pathology that is work related from the 2007 injury which was operated on. He also had shoulder pain and arm pain[.]

(Tr. 339).

In September 2013, Dr. Nichols reported that plaintiff complained of pain in his neck that radiated down his arms and pain in the upper back, both shoulders, both upper arms and forearms, both hands, the lower back, both hips, the buttocks, both upper legs and shins/calves, and both feet. (Tr. 277). Dr. Nichols reported that plaintiff had been treated for long-standing myelopathy the prior year and though there was no evidence of recurrent cord compression, there was minimal improvement in his symptoms following surgery, and no further surgical treatment was necessary or would be beneficial. (*Id.*). Dr. Nichols recommended that plaintiff follow up with Dr. Simons for continued pain management for non-surgical management of his symptoms.

(Tr. 511). Dr. Simons documented continued complaints of pain throughout the period of treatment, although plaintiff reported significant pain relief with medications and a spinal cord stimulator that was implanted on January 26, 2015. (Tr. 566-633, 1117-48). In January 2016, Dr. Simons reported that plaintiff had radicular symptoms into the arms. (Tr. 1117). Dr. Tayeb reported persistent, moderate to severe neck pain in his November 2016 report. (Tr. 1169).

In addition to evidence of persistent pain, there is some evidence of limitation of motion of the spine, the second element of Listing 1.04A. In March 2013, Dr. Simons reported plaintiff had limitation of range of motion of the neck with myofascial tightness. (Tr. 340). On August 27, 2014, Dr. Simons reported he was attempting to obtain approval for a spinal cord stimulator to improve "poor range of motion" in the neck and shoulder. (Tr. 456). Dr. John Ruch, D.C., who saw plaintiff on referral from Dr. Tayeb on October 5, 2016, reported that plaintiff had marked restriction of C4-5-6 movement and moderate limitation of cervical motion, particularly extension and flexion. (Tr. 1167).

Third, the record includes some evidence of muscle weakness. Prior to surgery, Dr. Nichols reported that plaintiff complained of longstanding weakness in both arms and dropping objects from his hands without his knowledge. (Tr. 309). The medical record includes reports of muscle weakness post-surgery. Dr. Simons reported some weakness of handgrip on March 29, 2013. (Tr. 340). Dr. Simons' records include reports of diminished hand grip in January 2014 (Tr. 324) and February 2014 (Tr. 322, 323), and diminished bilateral grip strength in March 2014 (Tr. 321).

Fourth, there is evidence of sensory loss as well as some evidence of reflex loss. Dr. Simons reported in March 2013 that there appeared to be some neuropathic pain associated with

plaintiff's condition. (Tr. 346). Objective findings in March 2013 included sensory changes in the upper extremities. (Tr. 340). Dr. Simons reported sensory changes bilaterally at C5-6 in April 2013. (Tr. 337). Dr. Simons also reported sensory changes in the C5-C6 dermatome bilaterally in January 2014 (Tr. 324), February 2014 (Tr. 322), and March 2014 (Tr. 321). Consultative examiner Dr. Bailey found on examination in July 2014 that plaintiff had "dense numbness of the hands and arms consistent with a prior radiculopathy." (Tr. 445). Dr. Ruch reported in October 2016 that plaintiff had "global loss of sensation over both upper extremities." (Tr. 1167). As for reflex loss, Dr. Tayeb found in October 2016 that deep tendon reflexes were diminished "on the right less than the left." (Tr. 1162). Dr. Ruch reported in early October that bilateral brachial reflexes were +1/2. (Tr. 1167).

Thus, the record appears to include at least some evidence to support each component of Listing 1.04A. The ALJ acknowledged at steps four and five of the sequential evaluation that plaintiff suffered some persistent symptoms and functional deficits post-surgery and during the period of alleged disability. (Tr. 25-27). The ALJ found that for at least a portion of the period of alleged disability, plaintiff's symptoms and functional limitations restricted him to a limited range of sedentary work with postural and manipulative limitations.[7] (Tr. 27). Despite acknowledging that plaintiff continued to experience debilitating symptoms of degenerative disc disease, the ALJ gave no indication that he considered evidence of post-surgery symptomology and deficits at step three. The ALJ did not evaluate whether plaintiff's symptoms satisfied the components of Listing 1.04 and, if not, whether plaintiff's condition medically equaled the

---

[7] The ALJ found that plaintiff's condition had improved as of October 2016 to the point whether plaintiff could perform light work, but the ALJ nonetheless limited plaintiff to a range of sedentary work for the entire period of alleged disability. (Tr. 27).

Listing. Medical equivalence was a particularly important assessment to make in this case given Dr. Nichols' prognosis that plaintiff was likely to suffer ongoing neurological deficits in light of longstanding cord compression. (Tr. 280). Because there are unresolved discrepancies between the medical evidence showing ongoing symptoms of cord compression and the ALJ's step three finding that there was no evidence of the requisite neurological deficits, the ALJ's findings at steps four and five of the sequential evaluation do not substantially support his cursory step three finding that plaintiff's degenerative disc disease did not meet or medically equal the severity of Listing 1.04. *Cf. Forrest,* 591 F. App'x 359.

The ALJ's failure to articulate a basis for his step three finding was not harmless error. Plaintiff was diagnosed with cervical myelomalacia, stenosis, myelopathy, and stenosis; medical evidence documented the likelihood that plaintiff would continue to experience residual symptoms following his surgery to relieve cord compression; and the record includes ample evidence of continuing symptomology. The ALJ failed to acknowledge evidence favorable to plaintiff and did not resolve conflicts in the evidence regarding improvement in plaintiff's condition post-surgery and continued symptoms that his treating surgeon opined could result from long-term cord compression. *See Layton ex rel. B.O.,* 2013 WL 5372798, at * 8 (citing *Rabbers,* 582 F.3d at 657-58). Had the ALJ properly analyzed the evidence at step three, and had the ALJ found based on the entire record that plaintiff's impairment met or equaled Listing 1.04A, plaintiff would be entitled to benefits regardless of the conclusions the ALJ reached at subsequent steps in the sequential evaluation. *See Reynolds,* 424 F. App'x at 416. It was therefore incumbent on the ALJ to "actually evaluate the evidence, compare it to Section 1.0[4] of the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review.

Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence." *Id*. (citations omitted).

Plaintiff's first assignment of error is therefore sustained. Because the ALJ must revisit step three of the sequential evaluation, the Court need not address plaintiff's second and third assignments of error relating to later steps in the sequential evaluation process. *Id.* at 417.

**III. This matter will be reversed and remanded for further proceedings**

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits. Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan,* 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.,* 17 F.3d 171, 176 (6th Cir. 1994). Remand for payment of benefits is warranted only "where proof of the disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking." *Id*.

This matter will be reversed and remanded pursuant to sentence four of § 405(g) for further proceedings consistent with this Order. All essential factual issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to benefits. *See Faucher,* 17 F.3d at 176. On remand, the ALJ should reevaluate the evidence and

explain the reasons for his finding at step three that plaintiff's severe degenerative disc disease does not meet or medically equal Listing 1.04.

## IT IS THEREFORE ORDERED THAT:

The decision of the Commissioner is **REVERSED** and **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

Date: 3/25/19

Karen L. Litkovitz
United States Magistrate Judge